OLIVER O'HARA AND OTHERS, APPELLANTS, *v.* THE UNITED STATES, APPELLEES.

A claim for land in East Florida, granted by Governor White to Daniel O'Hara, rejected by the Superior Court of East Florida, and the decree of that Court affirmed.

Governor White, on the petition of Daniel O'Hara, soliciting a grant of fifteen thousand acres, made a decree granting " the lands solicited" " at the place indicated," " in conformity with the number of workers which he may have to cultivate them, the corresponding number of acres may be surveyed to him," " and that he will take possession of said land in six months from the date of the grant." Held, that this is a decree not granting fifteen thousand acres as asked for; but so much at the place where it is asked for as shall be surveyed in conformity with the number of workers the grantee may have to cultivate the land; the quantity could be determined by the regulation of the Governor, made the month after the grant, and determining the quantity of land to be surveyed according to the number of persons in the family of the grantee, slaves included. That the grant was made before the date of the regulation, makes no difference.

No settlement was made on the lands claimed under the grant. The building of a house on the land, is but evidence of an intention to make a settlement, but was not a settlement; which required the removal of persons or workers to the land, and cultivating it.

No claim for the land can be sustained under a grant, or confirmation of a prior grant, made by a decree of Governor Coppinger in 1819, as the same was substantially a violation of the treaty with Spain, which confirms only grants made before the 24th January, 1819. The prior grant to O'Hara having become void by the nonperformance of the conditions annexed to it, the decree of Governor Coppinger in 1818, was an attempt to make a new grant.

If the grant were not void from the non-performance of the conditions of settlement annexed to it, the omission to have the land surveyed and returned to the proper office, would make it void, unless the grantee had made a settlement; in which event, a survey would be presumed. The grant was made in the " district of Nassau," &c.; this was an indefinite description of the land; as was held in Buyck *v.* The United States, decided at this term.

ON appeal from the Superior Court of East Florida.

In the Superior Court of East Florida, Oliver O'Hara, for himself and for the other heirs of Daniel O'Hara, presented a petition praying for the confirmation of a grant of fifteen thousand acres of land made by Henry White, then the Spanish

Governor of East Florida, on the 5th of September, 1803, to Daniel O'Hara, the father of the petitioners; and which was alleged to have been confirmed on the 3d of September, 1818, by the Spanish Governor Coppinger.

The grant; and the proceedings on the same are fully stated in the opinion of the Court.

Mr. Downing appeared as counsel for the appellants.

Mr. Gilpin, for the United States, contended :

The evidence of this grant is a certificate of Tomas de Aguilar, in the form of that commented upon in the case of The United States *v.* Wiggins, 14 Peters, 345. If this document be regarded as sufficient to establish the fact, that such a concession was actually made by Governor White; still there is no proof either of possession, or survey, or citizenship of the claimant; all of which were necessary to perfect a grant in Florida, to any quantity of land whatever.

The memorial of the claimant to Governor White, is dated the 3d September, 1803. He says that he has but lately become an inhabitant of the province, and that he " intends to settle" there. Two days afterwards he receives this grant, and on the same day leaves the province, to which, so far as the record shows, he never returned. Early in June, 1804, nine months subsequent to the concession, an agent at St. Augustine writes to him, as the record shows, urging him to " take possession of his lands" which he had not then done. On the 20th of June, in the same year, we have the decree of the District Court of the United States at Savannah, in an admiralty proceeding, where the claimant is a party. This shows that the brig Chance, being bound a regular voyage from Jamaica to South Carolina with some negroes on board, had been captured by a French privateer and recaptured by a British cruiser, and subsequently ransomed by the claimant. It is alleged that these negroes were the property of the claimant, who intended to place them on the tract lately granted to him in Florida; but no evidence of such intention is given; and if it existed it never was carried into effect, although the decree of the Court of Admiralty was in his favour. A witness, Francis Marien, was produced to prove that, soon after the grant, the claimant attempted a settlement; but it

appears from his cross examination, that he knew only, "from general information, that lands were granted to the claimant in East Florida; that the claimant informed him he had engaged a carpenter; and that the carpenter told him he was employed for the purpose of building a house;" there is no evidence whatever of such a house being commenced or built. From this time, until August, 1821, after the actual cession of the Floridas, there is no evidence of an attempt by the claimant at settlement and possession; in a letter then written to him from St. Augustine it is said that "endeavours will be used to put a family on his lands at Nassau, to begin a settlement and take possession, which is very necessary should be done." That it was done, then, or subsequently, is neither asserted nor proved. It is clear, therefore, that at no time did the claimant occupy or settle on the land alleged to be granted to him.

Nor was it ever surveyed so as to perfect the grant. The survey, by the authorized public surveyor, was an essential requisite to every grant under the Spanish land laws. 2 White's New Rec. 230. 238. 278. The order of survey accompanied or shortly followed the concession. None such is produced with this grant. Parol testimony, taken after this suit began, was introduced to establish, if possible, a survey in 1811; but the survey, if made, is not produced, nor is there any evidence that it was so made by the direction of any competent authority. In March, 1819, after the date of the treaty ceding the Floridas to the United States, a survey was made. It is that now relied on by the claimant. It was not only made without any authority, but when an order for a survey was solicited from Governor Coppinger, it was refused. Had the order been then granted, the survey would have been illegal, as was ruled by this Court, in the case of The United States v. Clarke, 8 Peters, 468; but, so far from being granted, it was explicitly refused.

Spanish citizenship was an indispensable requisite to the validity of a grant. The oath of allegiance was required as a primary condition. 2 White's New Rec. 232. 277. In a despatch of Governor White to the Marquis of Someruelos, 2 White's New Rec. 258. 250, he comments, in strong language, on the course pursued by persons who came into the province, hastily took the oath of allegiance, and immediately left it. He declares

VOL. XV.—2 A

such a proceeding to be an abandonment of the land granted to them. The evidence in this case shows such a proceeding on the part of the claimant. In the admiralty suit at Savannah, he declared himself to be, in June, 1804, a citizen of the United States. He always resided there; never in Florida. Was not this clearly an abandonment of any privileges he might have obtained by a short and temporary residence in Florida in 1803?

But if the grant had been perfected by survey and possession, what was its character? The claimant urges that it was a grant to him of fifteen thousand acres of land, and he asks to be confirmed in such a grant. But what says the concession of Governor White, on which he relies? It permits him to occupy lands, at the place indicated, "until the time when, in conformity to the number of workmen whom he may have to cultivate them, the corresponding number of acres may be surveyed to him;" and it requires that he shall " take possession of the said land within the term of six months from the date" of the concession. The grant was thus conditional, altogether, on the fact of possession within six months; the evidence is clear that there was no possession whatever, at any time. But had he taken possession, the quantity granted still remained conditional; it depended on the number of workers, according to the regulations which were freely discussed and passed upon by this Court, in the case of The United States *v.* Wiggins, 14 Peters, 341. 351. Where there were no workers, there could not be " a corresponding number of acres surveyed" to the grantee. By his failure to introduce them, he abandoned his grant; it became "of no value or effect, and should be considered as not made," 2 White's New Rec. 284. The argument, that it was revived by Governor Coppinger, in 1819, cannot be maintained. If it had been so revived, it would be subject to the original terms of settlement and cultivation by a proportionate number of workers, which have never been complied with to this day. But it was not so revived, and could not be. When the claimant applied to Governor Coppinger for an order of survey under the original grant, the endorsement of the Governor was, "not admitted." Had it been admitted, it would have been a violation of the eighth article of the treaty, 6 Laws of United States, 618; 2 White's New Rec. 210, which declared all grants made since the 24th January, 1818, void; for

such an act of Governor Coppinger would have been clearly a new grant, subsequent to that day, the former one, of 1803, having become totally void by the conduct of the grantee himself.

Mr. Justice WAYNE delivered the opinion of the Court.

Appeal from the Superior Court of East Florida.

The appellants are the heirs of Daniel O'Hara, and they claim the land in controversy, in virtue of an alleged grant, dated the 5th of September, 1803.

The grant was adjudged in the Court below, not valid.

The memorial for the grant; order of Governor White, to the commandant of engineers, to report upon it; the report of that officer; and the decree of the Governor; are as follow:

HIS EXCELLENCY THE GOVERNOR:

Don Daniel O'Hara, lately admitted an inhabitant of this province, under the protection of his Catholic Majesty, with due respect represents to your excellency, that intending to settle in this province with a considerable property and his large family, after having ascertained that all, or the greatest number of all those who had petitioned for lands, have solicited to have them located in the southern district, in the vicinity of Musquito river, and after having consulted many neighbours in reference to vacant lands, as has no wish to enter into disagreeable litigation with other petitioners, or to injure them in any way, he begs of your excellency, be pleased to grant him fifteen thousand acres of land out of those lands which are vacant between the rivers St. John and St. Marys, in the place called Nassau, and in case the said vacant lands do not comprehend the number of acres he solicits, he begs your excellency to have the goodness, when the survey will take place, to grant him the deficiency on the river St. Marys, and he obligates himself to take possession of the said lands within the term of six months; which favour, he doubts not, he will receive from the noble munificence of your excellency

DANIEL O'HARA.

*St. Augustine of Florida, third of September, one thousand eight hundred and three.*

[O'Hara et al. *v.* The United States.]

DECREE.

*St. Augustine, 3d September,* 1803.     Let the commandant engineer inform on the subject.        WHITE.

Having taken cognisance of the petition, and in obedience to the preceding decree, I represent to your excellency, that the culture of the lands solicited by the petitioner does not interfere with the defence of the province, therefore, as far as the department of fortifications is concerned, your excellency may grant to him the number of acres you see fit.   This is all I have to represent to your excellency, who will determine according to your pleasure.         NICOLAS BARCELO.

*St. Augustine of Florida, 5th September,* 1803.

DECREE.

*St. Augustine, of Florida, 5th September, one thousand eight hundred and three.*

The lands solicited by the petitioner are hereby granted to him in the place indicated, without prejudice to a third party, and until the time when, in conformity to the number of workers whom he may have to cultivate them, the corresponding number of acres may be surveyed to him; it being well understood that he shall not claim indemnity for damages or losses in the case; that under the apprehension of an invasion, or other motives relating to the royal service, he be ordered to retire in the interior of the province; and that he will take possession of the said land within the term of six months from this date.      WHITE.

It will be perceived that the memorialist asks for fifteen thousand acres, as it is his intention, with his vast property and numerous family, to settle in the province.   He asks for it at the place called Nassau, and if it cannot be found vacant there, when the survey is made, that the deficiency may be granted on the river St. Marys; and he obliges himself to take possession within six months.   The decree of the Governor is, the lands " solicited by the petitioner, are hereby granted to him in the place indicated;" " in conformity to the number of workers which he may have to cultivate them, the corresponding number of acres may be surveyed to him;" " and that he will take possession of said land within the term of six months from this date."

It is a decree, then, not granting fifteen thousand acres as asked for, but so much in the place where it is asked for, as-shall be surveyed, in conformity to the number of workers he may have to cultivate the land; and as to what that quantity should be, there is no uncertainty, for we have the regulation of Governor White, promulgated by him, the month after the date of the decree; which states, to each head of a family of a new settler, there shall be granted fifty acres of land, and an equal quantity to a single person, widow or widower, and to the children or slaves of sixteen years of age, twenty-five acres each. This regulation, then, determines, in that respect, what the Governor intended to grant; and the conclusion that the grant was to be in conformity with the regulation, cannot be shaken by the suggestion that the decree was made before the date of the regulation, as it might be, if the grant had been for fifteen thousand acres in terms. There is no grant for any quantity; when it is found that the decree is restrained to a right to be determined by the number of workers which the memorialist shall have, that the Governor had the power to make a grant with such a restriction, and that so shortly after the decree was made, as the following month, he promulgated a general rule for grants to new settlers; the inference is good, until it is contradicted by some other fact, or other regulation applying to new settlers, that the memorialist was to take under the decree in his favour, as contemporary new settlers would have to take. The memorialist never made a settlement. The witness, Marien, says, he did attempt a settlement; that a house was built; and that O'Hara informed him he had employed a carpenter to build it; but the memorialist never took his family, nor negroes to the land. The construction of a house was no compliance with the condition of the grant. That act itself, could not, under the regulation, give a right to any number of acres. The right vested upon the persons, black and white, who might be carried to make a settlement. The house is good evidence of an intention to settle with persons; but if the evidence discloses the fact, that no persons or workers were ever taken to it; that cultivation was not begun, the inference is made the stronger, that the rights of the memorialist under the decree were abandoned.

The record discloses an attempt by the memorialist, immediately

2 A 2                     36

after the decree of the Governor, to get negroes from Jamaica for a settlement; and that the vessel in which they were embarked, was taken into Savannah and libelled in admiralty: but the proceedings in admiralty do not show that the memorialist was deprived, ultimately, of the negroes; and if he was not, and the negroes were restored, no cause is shown why they were not taken to Florida. But if they were not restored, it will scarcely be contended that an unfortunate attempt to carry negroes to take possession of the land, fulfils the intention of a grant, the quantity of which is to depend upon the number of workers actually employed in cultivation. But there was not only a failure to settle in this case, there was an actual abandonment. We hear nothing of the memorialist, or of any attempt to settle the land, from the spring of 1804 until 1819. There never was a survey of any land, by authority, though one is alluded to; until March, 1819; and that was made without the order of the Spanish authorities in Florida. Indeed, it was done against authority; for we find from the testimony in the cause, that O'Hara petitioned Governor Coppinger, on the 20th April, 1819, within a few months of sixteen years after Governor White's decree had been given upon his memorial, for an order of survey upon the decree, and that it was refused. We have, then, in this fact, a denial of the memorialist's right to the land by a Governor of Florida. There can be no doubt it was looked upon by Governor Coppinger as abandoned; and that the right to the same was lost under the 9th article of Governor White's regulations, already spoken of as contemporary with the decree upon the memorial of O'Hara. 2 White's New Rec. 278. It is not necessary for us to speak of a subsequent attempt, by O'Hara, to introduce negroes into Florida, in 1819, and its failure. This right to the land originally asked for, had ceased; he could make no claim under the decree of September, 1803: and a revival of the old grant by the Spanish authorities would have been substantially a violation of the treaty with Spain, which only confirms grants made before the 24th January, 1818.

With this view of the case, we think the decree of the Court below should be affirmed.

But, if the right of the appellants had not been lost by their neglect to settle the land with workers, we should say, the grant

itself was too indefinite to convey any land, unless a survey had been made, and had been recognised by the Spanish authorities; or unless the grantee had settled and occupied land under that decree, in which event a survey might be presumed. The memorialist asks for lands in the place called Nassau; and in the event of the whole quantity not being got there, for the deficiency to be made up on the river St. Marys. Such a place as the place called Nassau is not known, unless is meant by it all the land between Nassau river and the St. Johns and St. Marys. It is equidistant, or nearly so, from those rivers, and wends its way to the Atlantic, in a course of fifty or sixty miles. If the land is to be taken on the Nassau, where shall a survey be begun, and on what part of the St. Marys shall the deficiency in quantity be taken, supposing that a part can be found in the "place called Nassau." The St. Marys is known as the boundary between Florida and Georgia; and that its head, or source, is on the Oquafanoche swamp. It is navigable for a hundred miles from its mouth to the Atlantic, between Cumberland and Amelia islands. Where, then, shall a survey begin in this range, under this decree. It is no answer to say, the decree is for vacant land; and if there is vacant land there now, a survey could be made; for the place where the survey is to be made, must first be made certain, if not as to fixed boundaries, at least so certain, by evidence of general or popular apprehension, as to show what was the grantor's notion of the limits of country within which he intended to grant. Unless, then, a survey can be made of the original grant, in the place called Nassau, the alternative for any deficiency on the St. Marys river cannot be shown; which alone would entitle the memorialist to land there. This grant is therefore void, on account of uncertainty. It is not made, as the Court said in the case of Buyck *v.* United States, decided at this term, in such a way as to distinguish it from things of a like kind; nor has the identity of the grant been shown by extraneous evidence.

The judgment of the Court is affirmed.